**TIMOTHY A. SCOTT**
California Bar No. 215074
**NICOLAS O. JIMENEZ**
California Bar No. 295057
MCKENZIE SCOTT PC
1350 Columbia St, Suite 600
San Diego, CA 92101
Telephone: (619) 794-0451
Email: tscott@mckenziescott.com
       njimenez@mckenziescott.com

**MARK F. FLEMING**
California Bar No. 165770
SINGLETON SCHREIBER, *Of Counsel*
**KIMBERLY S. TRIMBLE**
California Bar No. 288682
SINGLETON SCHREIBER
450 A St, 5th Floor,
San Diego, CA 92101
Telephone: (619) 771-3473
Email: mfleming@singletonschreiber.com
ktrimble@singletonschreiber.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Albert Lopez, Teri Lopez, and A.X.L., a minor by and through his guardian ad litem Teri Lopez, <br><br> Plaintiffs, <br> vs. <br><br> Karl Hall (former Washoe Assistant District Attorney in Reno, Nevada); David Karpel (former DOJ AUSA), Matt Neal, (DHS Agent), Does 1 – 20, <br><br> Defendants. | Civil No. <br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

# INTRODUCTION

1. On June 16, 2017, at 5:00 am, Albert Lopez lay asleep with his wife, Teri Lynn Lopez, in their bedroom inside the well-manicured house they own on Dahlia Ridge Drive in Santa Clarita, CA. Albert and Teri's ten-year-old son was asleep next to their bed, underneath a tent of blankets and pillows he had built with his parents the night before.

2. In the darkness outside, roughly 20 federal and state agents, heavily armed with automatic weapons and clad head-to-toe in black, military-style tactical gear, crept to the front and back of the house. An armored military MRAP assault vehicle drove onto the front lawn. Agents positioned at the front door gripped a battering ram while waiting for a signal to storm the home.

3. A moment later, Mr. Lopez, a disabled veteran of the elite U.S. Army Rangers, jolted upright in his bed at the sound of his front and side doors being smashed in. The deafening roar of a police helicopter hovering just above the house nearly drowned out the sound of the agents as they stormed into the house, shouting obscenities while pointing their automatic weapons at Mr. Lopez, who had raced from the bedroom to confront the intruders.

4. Mr. Lopez was unarmed. His firearms, which he lawfully owned, were locked away in his gun safe. He yelled to the agents to not shoot and shouted that his wife and son were in the home. Agents forced Mr. Lopez to the ground and handcuffed him. Agents then handcuffed Teri Lopez while her terrified young son watched.

5. Agents told Mr. Lopez that he was under arrest for conspiracy to murder a man named Jethro Pettigrew, who was shot dead in a casino in Reno, Nevada in 2011. Agents then searched the house for hours, seized all of Mr. Lopez's weapons and boxes filled with his personal property. They ransacked the house and left the front and side doors hanging off the hinges. Mr. Lopez was taken into federal custody and jailed without bond for the murder of Mr. Pettigrew. He faced the death penalty.

6. The justification for charging Mr. Lopez with capital murder was based entirely on lies that Defendants coerced from witnesses prior to initiating grand jury proceedings, and prior to having probable cause to arrest Mr. Lopez.

7. Mr. Lopez spent 14 months jailed in Pahrump, Nevada before being released on bond in August of 2018.

8. From the date of his arrest in June 2017 until March 2018, when the Department of Justice declined to seek the death penalty, Defendants' unlawful conduct placed Mr. Lopez and his family in constant fear that he would be executed for a crime he did not commit.

9. From March 2018 until February 2019, Mr. Lopez and his family lived in constant fear that he would spend the rest of his life in prison for a crime he did not commit

10. On February 24, 2019, after a grueling seven-month federal jury trial in Las Vegas, Mr. Lopez was acquitted of all charges filed against him, including all charges related to the killing of Mr. Pettigrew.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Mr. Lopez is asserting causes of action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, as well as *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial portion of events giving rise to Plaintiffs' claims occurred in this judicial district, specifically, in the City of Santa Ana, California and Canyon City, California.

## PARTIES

13. Plaintiff Albert Lopez was, at all times relevant to this lawsuit, a resident of Santa Clarita, CA and a citizen of the United States.

14. Plaintiff Teri Lopez was, at all times relevant to this lawsuit, Albert Lopez's wife, a resident of Santa Clarita, CA and a citizen of the United States.

15. Plaintiff A.X.L. was, at all times relevant to this lawsuit, a minor and still is a minor, Albert Lopez's son, a resident of Santa Clarita, CA, and a citizen of the United States. Plaintiff A.X.L. appears in this action through his guardian ad litem Teri Lopez.

16. Defendant Karl Hall was, at all times relevant to this lawsuit, an Assistant District Attorney in Reno, Nevada, and was acting under color of state law. He is being sued in his individual capacity.

17. Defendant David Karpel was, at all times relevant to this lawsuit, a Trial Attorney with the Organized Crime and Gang Section of the United States Department of Justice in Washington, D.C., acting under color of federal law. He is being sued in his individual capacity.

18. Defendant Matthew H. Neal was, at all times relevant to this lawsuit, a Special Agent with the Department of Homeland Security ("DHS"), acting under color of federal law. He is being sued in his individual capacity. On information and belief, Defendant Neal was assigned to his duties to a DHS division in Orange County, CA and was and is a resident of the County of Orange, CA.

19. Mr. Lopez does not currently know the true names and capacities of Defendants Does 1 through 20 and therefore sues said defendants by such fictitious names. Mr. Lopez alleges that each of Does 1 through 20 is legally responsible in some manner for the harms alleged herein.

## FACTUAL ALLEGATIONS[1]

20. Plaintiff Albert Lopez is a former U.S. Army Ranger who was honorably discharged in 1997.

21. Since 2007, Mr. Lopez has been gainfully employed by Studio Utilities Local Union 724 at Universal Studios in Los Angeles.

---

[1] All facts set forth in this complaint are drawn from sworn trial testimony transcripts or from investigative reports authored by law enforcement and audio and video recordings turned over in discovery in the federal criminal case of *United States v. Albert Lopez*, 16cr265-GMN tried in Las Vegas, Nevada in 2019 and 2020.

22. Mr. Lopez has never been convicted of a crime.

23. In 2011, Albert Lopez was a member of the Vagos Motorcycle Club ("VMC"), an incorporated non-profit entity whose members are motorcycle enthusiasts.

24. On September 23, 2011, Mr. Lopez attended a motorcycle rally in Sparks, Nevada. Mr. Lopez stayed at the Nugget Hotel and Casino in Sparks. Hundreds of other attendees at the rally also stayed at the Nugget Hotel that night, including Vagos members Gary Rudnick and Jefferson Martin.

25. Mr. Rudnick had been drinking tequila and beer all day at the Nugget Hotel on September 23, 2011 and was heavily intoxicated by that evening.

26. At some point that evening, Mr. Rudnick began arguing in the casino bar with Jethro Pettigrew, a member of the Hells Angels Motorcycle Club.

27. Multiple witnesses and hotel video surveillance confirm that Mr. Rudnick, acting alone, instigated an argument with Mr. Pettigrew.

28. Various members of the VMC unsuccessfully attempted to calm Mr. Rudnick down to diffuse the situation.

29. Witnesses who testified under oath, including government witnesses, and the Nugget Hotel video surveillance confirm what happened next:

    a. Mr. Pettigrew hit Mr. Rudnick in the face with a beer bottle.

    b. Mr. Rudnick ran away.

    c. Mr. Pettigrew and another Hells Angels member Cesar Villagrana drew pistols.

    d. Mr. Pettigrew yelled "you want to get shot motherfucker" as both he and Mr. Villagrana fired their weapons at random people in the crowded casino.

    e. Two VMC members were shot (one in his stomach, the other in his leg) and fell to the floor.

    f. The two active shooters, Mr. Pettigrew and Mr. Villagrana, terrorized casino guests for several minutes.

      g.      Then, as Mr. Pettigrew pointed his weapon at another man who had fallen to the floor, he was shot and killed by VMC member Ernesto Gonzalez.

30. Mr. Lopez did not witness the altercation between Mr. Rudnick and Mr. Pettigrew. Mr. Lopez was not inside the hotel when Mr. Pettigrew was shot.

31. Mr. Lopez had no knowledge of any plan, by anyone, to harm or kill Mr. Pettigrew.

32. On November 15, 2011, Mr. Rudnick was arrested and charged by the Washoe County District Attorney's Office for instigating the fight with Mr. Pettigrew on September 23, 2011.

33. Karl Hall was the Washoe County prosecutor handling the case against Mr. Rudnick.

*Facts related to threats, coercion, and perjured testimony of Gary Rudnick*

34. On or about January 5, 2012, Mr. Rudnick was interviewed by Defendant Matthew Neal and San Bernardino Police Officer Erick Bennett at the Washoe County Sheriff's Office in Reno, Nevada. Mr. Rudnick provided a detailed statement concerning his knowledge of alleged criminal activity related to the Pettigrew shooting.

35. At the January 5 interview, Mr. Rudnick never claimed that Mr. Lopez or any other VMC member conspired to have Mr. Pettigrew killed.

36. Between January 5, 2012 and February 15, 2012, Mr. Rudnick met repeatedly with Assistant District Attorney ("Defendant") Karl Hall.

37. When they met, as later confirmed by Mr. Rudnick's under oath statements, Mr. Rudnick repeatedly told Defendant Hall that there was no conspiracy to kill Pettigrew.

38. Mr. Hall, despite unequivocal statements from Mr. Rudnick that there was no conspiracy, no other evidence to suggest the conspiracy, and evidence affirmatively showing the absence of such a conspiracy, Defendant Hall, acting under color of his authority as a prosecuting attorney, deliberately and knowingly told Rudnick to adopt a version of events that was factually untrue. He did so with knowledge and in reckless

6

COMPLAINT

disregard of the fact that the story he was feeding Mr. Rudnick was false and would likely subject innocent persons to prosecution.

39. Eventually, under threats and coercion, Mr. Rudnick adopted Hall's false story that members of the VMC conspired to have, during the time covered in this lawsuit, Mr. Pettigrew killed. Under threats and coercion by Defendants Karl Hall and Does 1 – 20, Mr. Rudnick provided a fictious list of VMC members who participated in a bogus conspiracy in a 'special meeting" at the Nugget Casino.

40. Based entirely on the uncorroborated statements of Mr. Rudnick, Ernesto Gonzalez was charged with conspiracy to murder Jethro Pettigrew by state authorities in Nevada.

41. On July 31, 2013, DA Hall called Mr. Rudnick to testify about the alleged conspiracy in Mr. Gonzalez's murder trial in Reno.

42. Parroting the lies fed to him by DA Hall, Mr. Rudnick falsely testified that there was a conspiracy to kill Mr. Pettigrew before Mr. Rudnick ever started arguing with him in the casino bar. He also recited the fictious list of VMC members who he testified conspired to kill Mr. Pettigrew. Mr. Rudnick's fictious list did not include Mr. Lopez.

43. Mr. Lopez's name was never mentioned in the 2,600 pages of transcripts generated at Ernesto Gonzalez's 2013 trial for conspiring to kill Jethro Pettigrew.

44. Ernesto Gonzalez was convicted by the jury of conspiracy to murder Mr. Pettigrew.

45. The Nevada Supreme Court reversed Mr. Gonzalez's conviction, noting "Rudnick's testimony about the alleged conspiracy which formed the basis for Gonzalez's convictions was uncorroborated by any other witness or evidence." *Gonzalez v. State*, 131 Nev. Adv. Op. No. 99, 12 (2015).

46. On or about February 10, 2016, Mr. Rudnick was interviewed by Defendants then Assistant United States Attorney David Karpel and Matthew Neal, and non-party Washoe County District Attorney Investigator Peter Grimm. Once again, this time in search of a

probable cause for a federal murder indictment, Mr. Rudnick was instructed to list the participants of the fabricated conspiracy to kill Mr. Pettigrew:

    a.    Mr. Rudnick provided a revised list of names at the interview.

    b.    Mr. Lopez's name was—again—not on the list.

47. On May 17, 2016, Mr. Rudnick in an under oath, videotaped confession recanted his statements and trial testimony concerning the fabricated conspiracy to kill Mr. Pettigrew.

48. In that sworn statement, Mr. Rudnick provided the following facts:

    a.    Mr. Rudnick admitted that there was no conspiracy to kill Mr. Pettigrew.

    b.    Mr. Rudnick told Karl Hall there was no conspiracy.

    c.    Defendant Hall refused to accept his truthful statements that there was no conspiracy.

    d.    Defendant Hall threatened him with 25 years imprisonment.

    e.    Defendant Hall provided him with the details of the fictitious conspiracy.

    f.    Defendant Hall promised him probation if he falsely implicated Mr. Lopez and others in a conspiracy to murder Mr. Pettigrew.

    g.    As a direct result of threats and coercion by Defendant Hall, Mr. Rudnick agreed to provide false statements that there was a conspiracy to kill Mr. Pettigrew.

    h.    As a direct result of threats and coercion by Defendant Hall, Mr. Rudnick testified falsely at Ernesto Gonzalez's state murder trial that there was a conspiracy to kill Mr. Pettigrew by members of the VMC.

49. On or about May 26, 2016, Mr. Rudnick failed to show up for a meeting with Defendants Neal and Karpel.  The same day, Defendants Neal and Karpel searched for and located Mr. Rudnick near a halfway house where he had been living at the time.

50. On or about June 8, 2016, Defendant Neal confronted Mr. Rudnick about his reluctance to meet with the government.  The confrontation included the following facts:

    a.    Defendant Neal told Mr. Rudnick that he (Defendant Neal) would find out if Mr. Rudnick was planning not to cooperate with the government any longer.

    b.    Mr. Rudnick requested "relocation" funds from the government.

    c.    Defendant Neal warned Mr. Rudnick that "government funds may no longer be available because of questions [the government had] regarding [Rudnick's] veracity, and as long as [the government] had those questions the government will be unable to provide him any financial assistance."

    d.    Defendant Neal then informed Mr. Rudnick that all financial assistance he was receiving for his cooperation would be cut off immediately.

51. On or about March 18, 2017, Defendants Neal and Karpel learned of Mr. Rudnick's May 17, 2016 sworn recantation detailed in paragraphs 39 and 40a - h.

52. Washoe County Investigator Peter Grimm told Mr. Rudnick *before* his June 2017 grand jury testimony that Defendant Karpel was "pissed off" at him for recanting his Gonzalez state trial testimony concerning the fictitious conspiracy to murder Mr. Pettigrew.

53. On or about May 4, 2017, Defendant Neal confronted Mr. Rudnick about his May 17, 2016 recantation. Under threats and coercion, Mr. Rudnick recanted his recantation and claimed he "made a mistake" and promised to testify against Mr. Lopez consistent with his false trial testimony in the Ernesto Gonzalez trial.

54. Defendants Karpel and Neal required Mr. Rudnick to meet with them approximately 10 times prior to his grand jury testimony in June 2017. During these meetings, Defendant Karpel threatened to prosecute Mr. Rudnick for the Pettigrew murder if he refused to implicate Mr. Lopez and other in the fictitious conspiracy to murder Mr. Pettigrew.

55. In short, to establish probable cause to arrest and charge Mr. Lopez with conspiracy to murder, Defendant Karpel and Defendant Neal coerced Mr. Rudnick to lie

and say that Mr. Lopez conspired to kill Mr. Pettigrew.  Defendants did so by repeatedly threatening to prosecute Mr. Rudnick for the murder of Mr. Pettigrew.

56.     Defendants Karpel and Neal provided Mr. Rudnick with the answers he was required to give to the grand jury that falsely implicated Mr. Lopez and others in a conspiracy to kill Mr. Pettigrew.

57.     On June 6, 2017, Defendant Karpel called Mr. Rudnick to testify before the federal grand jury in Santa Ana that indicted Mr. Lopez for conspiracy to murder Mr. Pettigrew.  Mr. Rudnick's false testimony to the grand jury, during which he recanted his May 17, 2016 sworn statement, was a direct result of intimidation, threats and coercion by the Defendants.

58.     Based on Mr. Rudnick's perjured testimony (and that of Jefferson Martin, described below), Mr. Lopez was indicted on capital charges of conspiracy to murder Jethro Pettigrew.

59.     Several days after the Santa Ana grand jury indicted Mr. Lopez, agents raided his home in Santa Clarita, CA, and he was held without bond in Pahrump, Nevada. (Plaintiff incorporates and realleges Introduction paragraphs 1 – 10 here).

60.     On November 28, 2017, Mr. Rudnick was interviewed in person for three hours by learned counsel for Mr. Lopez, Mark Fleming, and his investigator, retired FBI Agent Scott Bakken.  During that interview, Mr. Rudnick provided the following facts:

    a.     Albert Lopez was never part of a conspiracy to kill Mr. Pettigrew.
    b.     Defendant Hall threatened to send Mr. Rudnick to prison for 25 years if he did not falsely testify that there was a conspiracy to kill Mr. Pettigrew.
    c.     Defendant Hall fed Mr. Rudnick the facts of the bogus conspiracy.
    d.     Defendant Hall promised Mr. Rudnick probation if he falsely testified there was a conspiracy to kill Mr. Pettigrew.
    e.     Mr. Pettigrew was killed because of a spontaneous bar fight.
    f.     There was no conspiracy to kill Mr. Pettigrew.

61. On December 15, 2017, Mr. Lopez's defense counsel informed Defendant Karpel and Las Vegas Assistant United States Attorneys Cristina Silva and Christopher Burton, in writing, of the November 28 meeting with Mr. Rudnick. The letter included the specific facts set forth in paragraph 60a – f.

62. In August 2019, Mr. Lopez was put on trial for conspiracy to murder Mr. Pettigrew in federal court in Las Vegas. *See United States v. Pastor Palafox, et. al.*, 16CR265-GMN.

63. Mr. Rudnick testified as a government witness against Mr. Lopez at trial. After initially denying that he even met with Mr. Lopez's counsel and investigator and repeating the conspiracy story fed to him by Defendants, Mr. Rudnick was appointed counsel.

64. Mr. Rudnick ultimately testified that the facts set forth in paragraph 63a-f were true and that he had initially committed perjury when he claimed there was a conspiracy to kill Mr. Pettigrew.

*Facts related to threats, coercion, and perjured testimony of Jefferson Martin*

65. In 2011, Jefferson Martin was a member of the Vagos Motorcycle Club.

66. On or about September 23, 2011, Mr. Martin attended the motorcycle rally in Sparks, Nevada.

67. Mr. Martin stayed at the Nugget Hotel and Casino in Sparks during the rally.

68. On May 3, 2012, Mr. Martin was interviewed about the shooting of Mr. Pettigrew by Defendant Matthew Neal and non-parties Washoe County Detective Robert Begbie and Sparks Police Department Detective John Patton. The interview occurred at Mr. Martin's home in Buena Park, CA. Mr. Martin stated the following during the interview:

    a. Mr. Martin was asleep in his room at the Nugget Hotel when Mr. Pettigrew was shot.

    b. Mr. Martin did not attend a meeting where people discussed killing Mr. Pettigrew.

   c. Mr. Martin knew nothing about a conspiracy to kill Mr. Pettigrew.

69. On April 1, 2015, Mr. Martin was interviewed by Defendant Matthew Neal. During this meeting, Defendant Neal lied to Mr. Martin, claiming Mr. Rudnick had implicated him in the killing of Mr. Pettigrew. In response, Mr. Martin relayed the following:

   a. Mr. Martin stated he had recently had a heart attack, was in poor health, and was taking five types of medication that make him forgetful.

   b. Mr. Martin stated that was no conspiracy to kill Mr. Pettigrew.

   c. Mr. Martin stated that there was no "side meeting" at the Nugget where killing Mr. Pettigrew was discussed.

   d. Mr. Martin stated that Mr. Rudnick probably told agents he was involved because Mr. Rudnick does not like Mr. Martin.

   e. Mr. Martin stated that in over three years since Mr. Pettigrew was killed, Mr. Martin has never heard anyone claim there was a conspiracy to kill Pettigrew.

   f. Defendant Neal falsely told Mr. Martin that the VMC leadership could "order a hit" on someone.

   g. Defendant Neal falsely told Mr. Martin that video surveillance from inside the Nugget Casino "corroborates the murder [of Pettigrew] was planned."

   h. Mr. Martin expressed concern that he could be arrested based on Defendant Neal's false statements.

70. On April 2, 2015, Mr. Martin called Defendant Neal and told him he feared being arrested. During that phone call, Mr. Martin reiterated that Mr. Rudnick simply started a fight with Mr. Pettigrew, and someone got shot.

71. On April 29, 2015, Defendants Karpel and Neal interviewed Mr. Martin at the Homeland Security office in Santa Ana, CA. Fearing arrest, Mr. Martin told Defendants Karpel and Neal he would "*say whatever you want me to say.*"

72. On April 30, 2015, Mr. Martin called Defendant Neal and expressed concern that Defendant Karpel "did not believe him" when he told him there was no conspiracy to kill Mr. Pettigrew. In response, Defendant Neal told Mr. Martin to testify to the fictious conspiracy to kill Mr. Pettigrew.

73. On May 10, 2016, Defendants Karpel and Neal met again with Mr. Martin and coerced him to make the following false statements:
   a. Martin was present during a "side meeting" at the Nugget on September 23, 2011.
   b. Eight VMC members were at the same meeting (not including Mr. Lopez).

74. On March 15, 2017, Defendants Karpel and Neal, and Washoe County Investigator Peter Grimm met with Mr. Martin. The following occurred:
   a. Martin again named individuals at the fictitious side meeting (but did not name Mr. Lopez).
   b. Martin falsely stated that one of the participants of the fictitious meeting warned everyone to "watch their backs because shit is going down."
   c. Martin was shown pictures and given names by Defendants Karpel and Neal of individuals who they wanted Martin to implicate in the fictitious conspiracy to kill Pettigrew.

75. Defendant Karpel required Mr. Martin to meet with Defendants to go over Mr. Martin's fictitious story on at least five occasions before the Santa Ana grand jury in June of 2017, prior to there being probable cause to arrest or charge Mr. Lopez.

76. On June 7, 2017, Defendant Karpel called Mr. Martin to testify before the Santa Ana grand jury that indicted Mr. Lopez for conspiracy to murder Mr. Pettigrew.

77. Mr. Martin provided perjured testimony to the grand jury that Mr. Lopez and others were part of a conspiracy to kill Mr. Pettigrew.

78. Mr. Martin was a government witness in the Las Vegas federal trial against Mr. Lopez.

79. During Mr. Lopez's trial, Mr. Martin admitted the following facts:

      a.      Mr. Martin changed his story and lied due to threats and coercion by the Defendants, particularly Defendant Karpel.

      b.      Defendant Karpel fed him the names of the people he wanted Mr. Martin to implicate in a bogus conspiracy to kill Mr. Pettigrew.

      c.      Defendant Karpel is a "scary little man."

      d.      Mr. Martin repeatedly told law enforcement that he had no specific knowledge of illegal activity committed by members of the VMC.

80. It was made clear to Mr. Martin by the Defendants that if he did not falsely implicate Mr. Lopez and others in a fictitious conspiracy to kill Mr. Pettigrew, he would be going to jail for a long time.

81. Mr. Martin was under intense pressure to lie for Mr. Karpel "for years," including a significant time before Mr. Lopez was indicted, up through the time of his trial testimony in 2019.

82. On February 24, 2020, after a grueling seven-month long trial, Mr. Lopez was acquitted by jury verdict of all charges, including the charge that he conspired to have Mr. Pettigrew killed.

## I.
## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983: Fabrication of Evidence
### (By Plaintiff Lopez Against Defendant Hall)

83. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

84. Plaintiff Albert Lopez had a Fifth and Fourteenth Amendment right to be free from being subjected to criminal charges and prosecution on the basis of false evidence deliberately fabricated by the government.

85. Defendant Hall, while acting under color of state law, violated these rights by deliberately fabricating evidence that was used to criminally charge and prosecute Plaintiff.

86. Defendant Hall, while acting under color of state law, violated these rights by continuing his investigation of Plaintiff Albert Lopez despite the fact that he knew that Plaintiff Albert Lopez was innocent, or was deliberately indifferent to Plaintiff Albert Lopez's innocence, and the results of the investigation were used to criminally charge and prosecute Plaintiff Albert Lopez.

87. Defendant Hall, while acting under color of state law, used techniques that were so coercive and abusive that he knew, or was deliberately indifferent, that those techniques would yield false information that was used to criminally charge and prosecute Plaintiff Albert Lopez.

88. As a result of Defendant Hall's, and each of his, violations of Plaintiff's constitutional right to not have false evidence used to criminally charge and prosecute him, Plaintiff was harmed as alleged herein and suffered damages to be proven at the time of trial in this matter.

## II.

## SECOND CAUSE OF ACTION

### *Bivens* – 5th Amendment Due Process Violation: Fabrication of Evidence
### (By Plaintiff Lopez Against Defendants Karpel and Neal)

89. Plaintiffs reallege and incorporate herein each and every allegation contained in the preceding paragraphs.

90. This cause of action is brought pursuant to *Bivens v. Six Unknown Named Federal Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

91. Plaintiff Albert Lopez had a Fifth Amendment right to be free from being subjected to criminal charges and prosecution on the basis of false evidence deliberately fabricated by the government.

92. Defendants Karpel and Neal, while acting under color of federal law, violated these rights by deliberately fabricating evidence that was used to criminally charge and prosecute Plaintiff Albert Lopez.

93. Defendants Karpel and Neal, while acting under color of federal law, violated these rights by continuing their investigation of Plaintiff Albert Lopez despite the fact that they knew that Plaintiff Albert Lopez was innocent, or were deliberately indifferent to Plaintiff Albert Lopez's innocence, and the results of the investigation were used to criminally charge and prosecute Plaintiff Albert Lopez.

94. Defendants Karpel and Neal, while acting under color of federal law, used techniques that were so coercive and abusive that they knew, or were deliberately indifferent, that those techniques would yield false information that was used to criminally charge and prosecute Plaintiff Albert Lopez.

95. As a result of Defendant Karpel's and Neal's, and each of their, violations of Plaintiff Albert Lopez's constitutional right to not have false evidence used to criminally charge and prosecute him, Plaintiff Albert Lopez was harmed as alleged herein and suffered damages to be proven at the time of trial in this matter.

## III.

## THIRD CAUSE OF ACTION

## 42 U.S.C. § 1983: Interference with Family Association

## (By Plaintiffs against Defendant Hall)

96. Plaintiffs reallege and incorporate herein each and every allegation contained in the preceding paragraphs.

97. Plaintiff Albert Lopez had a First, Fifth, and Fourteenth Amendment right to the care, custody, control, comfort, love, society, and companionship of his son.

98. Plaintiff Teri Lopez had a First, Fifth, and Fourteenth Amendment right to the care, love, society and companionship of her husband.

99. Plaintiff A.X.L. had a First, Fifth, and Fourteenth Amendment right to the care, custody, control, comfort, love and companionship of his father.

100. Defendant Hall unwarrantedly interfered with these rights through his actions against Plaintiff Albert Lopez as described in this Complaint.

101. As a direct, proximate, and foreseeable cause of Defendant Hall's actions, Plaintiff Albert Lopez was incarcerated for 14 months and separated from his family.

102. As a direct, proximate, and foreseeable cause of Defendant Hall's actions, Plaintiffs lost the care, custody, control, comfort, love, society, and companionship of each other.

103. As a direct, proximate, and foreseeable cause of Defendant Hall's actions, Plaintiffs were harmed as alleged herein and suffered damages to be proven at the time of trial in this matter.

## IV.
## PUNITIVE DAMAGES

104. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

105. Prior to Defendants initiating any judicial process against Albert Lopez, and prior to Defendants having probable cause to arrest and/or charge Albert Lopez with any crime, Defendants deliberately coerced false statements from Rudnick and Martin implicating Albert Lopez in a fictitious murder conspiracy.

106. Defendants' actions in coercing these false statements were done in an investigatory capacity—that is, in an attempt to search for evidence and corroborate their theories, in an effort to establish probable cause to arrest and prosecute Albert Lopez for conspiracy to commit murder.

107. Defendants knew that, in coercing these false statements, Albert Lopez would be arrested and prosecuted for conspiracy to commit murder.

108. Albert Lopez was, in fact, arrested and prosecuted for conspiracy to commit murder based on this falsified evidence—namely, the coerced statements by Rudnick and Martin— that Defendants procured prior to the 2017 grand jury leading to Albert Lopez's indictment. The arrest and false prosecution of innocent persons like Albert Lopez was also a natural, probable, and entirely foreseeable consequence of Karl Hall and his D.A.'s

office using his power as a prosecutor to knowingly manipulate a cooperator into fabricating a false criminal conspiracy.

109. There was no probable cause to arrest or charge Albert Lopez for any crime without these false statements. Albert Lopez was acquitted of all charges when the falsity of these statements was revealed.

110. Defendants' actions in coercing these false statements violated Albert Lopez's right to due process under the Fifth Amendment to the U.S. Constitution.

111. Defendants' actions in coercing these false statements actually and proximately caused Albert Lopez to suffer economic damages, including the costs of being in custody, lost wages, and legal fees, and to suffer non-economic damages, including loss of liberty and enjoyment of life, emotional distress, mental suffering, fear, anxiety, humiliation, and inconvenience.

112. Defendants' actions in coercing these false statements were, moreover, done knowingly and/or in reckless disregard of Albert Lopez's rights and, as such, Albert Lopez seeks an award of punitive damages against Defendants to punish their conduct and deter such conduct in the future.

## V.
## DEMAND FOR JURY TRIAL

113. Plaintiffs request a jury trial on all claims and causes of action alleged herein.

//
//
//
//
//
//
//
//
//

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against defendants as follows:

114. Compensatory damages, including economic and non-economic damages in an amount according to proof;

115. Punitive and exemplary damages;

116. Attorneys' fees under and costs of suit as allowed by law;

117. And for such other and further relief as the Court may deem proper.

Dated: February 18, 2022

Respectfully Submitted,

MCKENZIE SCOTT PC

*s/Timothy A. Scott*
**TIMOTHY A. SCOTT**

*s/Nicolas O. Jimenez*
**NICOLAS O. JIMENEZ**

SINGLETON SCHREIBER

*s/Mark F. Fleming*
**MARK F. FLEMING**
*Of Counsel*

*s/Kimberly S. Trimble*
**KIMBERLEY S. TRIMBLE**

Attorneys for Plaintiffs